2026 IL App (1st) 242241-U

No. 1-24-2241

Order filed July 21, 2026

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos.  78 C 941 |
| | ) | 78 C 942 |
| KARI FORD, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Alfredo Maldonado, |
| | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1 *Held*:    We affirm the trial court's denial of defendant's recovery application under the Sexually Dangerous Persons Act over defendant's contention that the trial court's ruling that he remains a sexually dangerous person is against the manifest weight of the evidence.

¶ 2    Defendant Kari Ford appeals the trial court's denial of his recovery application under section 9 of the Sexually Dangerous Persons Act (the Act) (725 ILCS 205/9 (West 2024)).

Defendant argues that the trial court's finding that he remains sexually dangerous is against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                        A. The Sexually Dangerous Persons Act

¶ 5      Under the Act, "the State may seek an involuntary, indeterminate commitment in lieu of a criminal prosecution if a defendant is charged with a criminal offense and is believed to be sexually dangerous." *People v. Burns*, 209 Ill. 2d 551, 553 (2004). A sexually dangerous person is one who has (1) suffered from a mental disorder for at least one year, (2) a criminal propensity to commit sex offenses, and (3) a demonstrated propensity toward acts of sexual assault or child molestation. 725 ILCS 205/1.01 (West 2024). When a court finds a defendant to be sexually dangerous, it commits him to the Illinois Department of Corrections (IDOC) for treatment until he recovers. *Id.* § 8. The Act's purpose is to ensure that sexually dangerous persons undergo treatment and to protect the public by sequestering sexually dangerous persons while they undergo treatment. *People v. Trainor*, 196 Ill. 2d 318, 324 (2001).

¶ 6      At any time after a defendant is committed under the Act, he may file a recovery application alleging that he is no longer sexually dangerous and requesting discharge or conditional release. 725 ILCS 205/9 (West 2024). Defendant's 2024 recovery application is at issue in this appeal.

¶ 7                        B. Defendant's Commitment and Prior Releases

¶ 8      In 1978, the State charged defendant with one count each of rape (Ill. Rev. Stat. 1975, ch. 38, par. 11-1) and robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18-1) in case numbers 78 C 941 and 78 C 942. The cases arose from two separate incidents in February 1978 in which defendant unlawfully gained entry to elderly women's apartments and sexually assaulted them. The State

petitioned to have defendant adjudicated a sexually dangerous person. Following a stipulated bench trial, on October 25, 1979, the court adjudicated defendant a sexually dangerous person and committed him to IDOC custody.

¶ 9    The court first granted defendant conditional release in 2006. In April 2008, defendant removed his GPS tracking device and "was gone for 16 hours spending time with a female friend," which led to the revocation of his conditional release and return to IDOC custody in May 2009. Defendant remained in IDOC custody until 2017, when the court again granted conditional release. In May 2018, the State sought revocation of conditional release based on defendant engaging in unauthorized movement to hotels in Chicago and allowing his GPS tracking device's battery to expire. In June 2018, the court issued an arrest warrant and took defendant into custody. Following a hearing in October 2018, the court found that defendant violated the terms of his conditional release but returned him to conditional release in February 2019. In August 2019, defendant again failed to maintain GPS tracking and absconded until police arrested him in December 2019. In February 2020, defendant pled guilty to failure to register as a sex offender. The court revoked defendant's conditional release and returned him to IDOC custody in March 2020.

¶ 10                    C. 2024 Recovery Proceedings

¶ 11    On January 25, 2024, defendant, acting as a self-represented litigant, filed a "writ of recovery" seeking release. He alleged that he had "actively engaged in the treatment program at Big Muddy River Correctional Center," was "no longer sexually dangerous," and was "ready to return to society." The court ordered IDOC to prepare a socio-psychiatric report pursuant to the Act (see 725 ILCS 205/9(a) (West 2024)) and appointed counsel to represent defendant.

¶ 12      On May 1, 2024, appointed counsel filed an amended recovery application. The amended application alleged that the court-ordered evaluator, licensed clinical psychologist Dr. Kimberly Weitl, had concluded that defendant no longer appeared sexually dangerous, but it was impossible to determine with certainty whether he had fully recovered while he was in institutional care. Dr. Weitl recommended that the court release defendant conditioned on supervision and further treatment. The amended application argued that, based on Dr. Weitl's report, defendant was entitled to conditional release under section 9(e) of the Act, which provides for conditional release when the person at issue "appears no longer to be dangerous" but "it is impossible to determine with certainty under conditions of institutional care that the person has fully recovered." *Id.* § 9(e).

¶ 13                                    1. Recovery Hearing

¶ 14      On July 10, 2024, defendant's amended recovery application proceeded to a bench hearing. Dr. Weitl was the only witness. The court qualified her as an expert in psychology and in evaluating sex offenders for civil commitment.

¶ 15      Dr. Weitl evaluated defendant to determine whether he was still a sexually dangerous person. She reviewed defendant's criminal history, prior evaluations, IDOC master file, sex offender treatment program file, and disciplinary records. She also interviewed defendant for approximately 90 minutes on February 28, 2024. Defendant was appropriate and cooperative during the interview. Dr. Weitl identified her March 21, 2024, evaluation report and the State moved it into evidence. The facts below consist of Dr. Weitl's testimony supplemented with her report where appropriate. Defendant was 67 years old at the time of Dr. Weitl's evaluation.

¶ 16                              a. Defendant's Background and Commitment

¶ 17    Dr. Weitl testified that defendant's mother died when he was young, his father abandoned him, and his grandmother raised him. Defendant's uncle abused him and he had sexual experiences with his siblings and a cousin. Defendant became sexually active at a young age but had no consistent romantic relationships. Defendant being raised by his grandmother engendered resentment, hostility, and sexual sadism toward elderly women, and he "idolized" his father for allegedly sexually assaulting his grandmother. As a young teenager, defendant began fantasizing about sexually assaulting older women. During his interview with Dr. Weitl, defendant admitted sexually assaulting at least five elderly women between 1974 and early 1978, before the charges that gave rise to this case. According to Dr. Weitl's report, defendant was charged with rape in four cases between March and September 1974, and attempted rape in two cases between July 1975 and April 1976. None of those charges resulted in convictions.

¶ 18    On February 10, 1978, when he was 21 years old, defendant sexually assaulted an 81-year-old woman in her apartment. One week later, on February 17, 1978, defendant sexually assaulted an 87-year-old woman in the same apartment building. In both cases, defendant gained entry to the elderly women's apartments by posing as a plumber or a police officer and stole cash from the women. During his interview with Dr. Weitl, defendant admitted committing both sexual assaults. He also admitted that both sexual assaults were violent, which aroused him, and described the second assault as "the closest that he came to killing someone." The State charged defendant with rape and robbery in case numbers 78 C 941 and 78 C 942. The first case was premised on the February 10 assault, and the second case was premised on the February 17 assault. These charges resulted in the court adjudicating defendant a sexually dangerous person in 1979.

¶ 19    Early in his commitment, defendant fought and engaged in sexual behavior with other inmates. In 1982, he wrote a letter threatening to kill an IDOC staff member. In 1986, defendant "fantasized about mutilating a male counselor and raping and murdering that staff member's wife and children."

¶ 20                                    b. Prior Conditional Releases and Treatment

¶ 21    The court first conditionally released defendant in 2006. Defendant admitted to Dr. Weitl that, while on conditional release, he used crack cocaine, marijuana, and alcohol, viewed pornography, and engaged in phone sex. Defendant also had sex with at least two women he met online, both of whom were intoxicated during the sexual encounters. In addition, defendant sexually abused an animal and had fantasies about past victims and minors. In 2009, the court revoked defendant's conditional release due to his failure to maintain GPS tracking and he returned to IDOC custody that May. Defendant underwent mental health treatment while in custody.

¶ 22    The court again granted defendant conditional release in January 2017, and he was released in November 2017.[1] Defendant reported that during his second conditional release, he did not experience the sexual deviancy issues he experienced during his first conditional release. Dr. Weitl explained that, in this context, sexual deviancy refers to defendant fantasizing about or becoming aroused by violent nonconsensual sex.

¶ 23    However, in August 2019, defendant absconded and did not register as a sex offender. In his interview with Dr. Weitl, defendant stated that he absconded because he struggled to hold a job, had conflict with the woman who managed his housing, and became hopeless and suicidal.

_____

[1]The trial court judge who presided over the 2024 recovery hearing took "judicial notice of the second conditional release because" he also presided over the second conditional release proceedings.

Dr. Weitl explained that defendant had a sense of entitlement and unrealistic expectations about what life on release would be like, that he became frustrated and depressed because he lacked social support, and that he "just g[ave] up." The court issued a warrant for defendant's arrest, and police arrested him in December 2019. In February 2020, defendant pled guilty to failure to register as a sex offender. The court sentenced him to three years in prison, revoked his conditional release, and returned him to IDOC custody.

¶ 24    When defendant returned to IDOC custody in March 2020, he struggled to participate in treatment partially due to depression and partially out of embarrassment that "[h]e was given a second opportunity at conditional release and he blew it." Defendant "signed out" of treatment on June 1, 2020, but resumed treatment in January 2021. Defendant began group therapy in May 2021 but was removed after missing all sessions in June and July 2021. Defendant resumed individual treatment in January 2022 and group therapy in March 2022.

¶ 25    During his interview with Dr. Weitl, defendant admitted experiencing "sadistic fantasies and behaviors. When the victim suffered, he became more aroused." Specifically, defendant became aroused when he forced victims to crawl or kneel, struck them with whips or chains, tied them up, blindfolded them, or spanked them, and when he sexually assaulted and strangled victims to overpower them. Defendant described feeling compelled to sexually assault women and "put a lot of emphasis on" his father sexually assaulting his grandmother. Defendant admitted that in 2012, he masturbated to a deviant fantasy about a female IDOC staff member at whom he was angry. He claimed that was the last time he masturbated to a deviant fantasy.

¶ 26    Defendant "demonstrated some good insight as to the reasons he failed on conditional release" in the past. He acknowledged that during his first conditional release, he "did not use the

tools he had learned" to control his sexual urges. Defendant's second conditional release involved "issues with his antisocial personality" more so than sexual deviance. Treatment had taught defendant "how to deal with stressful situations" and he had "demonstrated an ability to do that while in" custody. Defendant was in good physical health and ran three miles shortly before his interview with Dr. Weitl.

¶ 27                                         c. Mental Disorders

¶ 28     Dr. Weitl diagnosed defendant with three mental disorders: (1) sexual sadism in a controlled environment, (2) antisocial personality disorder, and (3) substance use disorder in a controlled environment.

¶ 29     Dr. Weitl explained that sexual sadism in a controlled environment involves "a period of at least six months of recurrent, intense sexual urges and sexually arousing fantasies involving acts in which the psychological or physical suffering (including humiliation) of the victim is sexually exciting to the individual." Defendant met those criteria because he had engaged in sadistic sexual behavior and experienced sadistic sexual fantasies.

¶ 30     Antisocial personality disorder involves "disregard for and violation of the rights of others." Dr. Weitl explained that defendant demonstrated this disorder throughout his life by engaging in nonconsensual sex, theft, and deceit, initiating fights, using weapons, and showing a lack of empathy and remorse.

¶ 31     Substance use disorder in a controlled environment involves "a pattern of substance abuse that causes clinically significant impairment or distress manifested in several important areas of the individual's life." Defendant met those criteria based on his "history of drug/or alcohol abuse

that included him being under the influence during the commission of a sexual offense." He "acknowledged that substance use increases his risk of sexual recidivism."

¶ 32                          d. Likelihood to Reoffend and Support Needs

¶ 33    Dr. Weitl evaluated defendant using two actuarial tools, the Static-99R and the Stable-2007, as well as her clinical judgment.

¶ 34    The Static-99R uses 10 weighted characteristics to evaluate a sex offender's likelihood to reoffend. For example, defendant received the maximum score in the category of prior sex offenses due to the number of charges against him over the course of his life. Defendant's overall score of two was in the average range for recidivism among sex offenders. Prior to 2017, defendant's overall score was five or six, but it decreased when he turned 60 years old because the risk of recidivism generally declines after that age.

¶ 35    The Stable-2007 uses 13 factors to evaluate how a person has changed since committing a sex offense. Defendant's score was 17 out of 26, which reflected a "high level for needs" such as supervision, treatment, and social support. Dr. Weitl's report explained that "[w]hen this score is combined with his Average score from the Static-99R, [defendant] falls in the Well Above Average priority category for intervention and supervision compared to other sex offenders."

¶ 36    Dr. Weitl identified risk factors such as defendant's sexual deviance and violence, sexual preoccupation, antisocial lifestyle, prior unsuccessful conditional releases, use of sex as a coping mechanism, substance abuse, and hostility toward women. She also identified two protective factors, defendant's age and progress in treatment. These factors largely overlapped with the actuarial analyses.

¶ 37                          e. Dr. Weitl's Opinion

¶ 38    Dr. Weitl opined that defendant "no longer appears sexually dangerous" but "it is not possible to determine with certainty that there has been a full recovery while he is under the conditions of institutional care." She concluded that defendant should be conditionally released but would need continued treatment, supervision, and support. Defendant's claim that he had learned to control his sexually deviant urges was corroborated by the fact that he did not engage in sexually deviant behavior during his conditional release from 2017 to 2020. However, Dr. Weitl acknowledged that her understanding of defendant's behavior during that conditional release was based largely on defendant's self-reporting.

¶ 39                                    2. The Trial Court's Ruling

¶ 40    The trial court denied defendant's recovery application. The court acknowledged Dr. Weitl's opinion that defendant no longer appeared sexually dangerous. However, the court explained that defendant had "a demonstrated history of sexual sadism" and suffered from "antisocial personality disorders." The court reasoned that Dr. Weitl did not identify any specific coping mechanisms defendant could employ, and the primary protective factor she identified was defendant's age, which the court discounted due to his good physical health.

¶ 41    The court also acknowledged that defendant's "scores on the standardized testing" were "below what *** would make [him] a sexually dangerous person," but found that those scores were "still high." The court highlighted defendant's "demonstrated history of sexual violence, the two sexual assaults that he was charged with, plus the several other sexual assaults that [he] admitted to Doctor Weitl and others throughout the history of his commitment," as well as his unsuccessful prior conditional releases. The court noted that defendant "still ha[d] trouble with females," consistent with his history as a sexually dangerous person. The court concluded that

"notwithstanding Doctor Weitl's testimony, everything I have heard \*\*\* still to me indicates that [defendant] is still a sexually dangerous person. I think every progress that she testified [to], there isn't really an objective standard to measure that.

Despite her opinion, the substance of her testimony still leads me to the conclusion that the State has proved by a clear and convincing standard that [defendant] is still a sexually dangerous person, and his application for recovery will be denied."

¶ 42                                    3. Motion to Reconsider

¶ 43     Defendant filed a motion to reconsider. Relevant here, defendant argued that the State had the burden of proving by clear and convincing evidence that he was still sexually dangerous, yet the State introduced no evidence to support that conclusion. Defendant contended that the only evidence before the court was Dr. Weitl's unrebutted expert opinion that defendant no longer appeared sexually dangerous, which the court was not free to reject. Defendant also argued that the court could not rely on the "substance" of Dr. Weitl's testimony because the facts underlying her opinion were "admitted for the limited purpose of explaining the basis of her opinion and not as substantive evidence."

¶ 44     At a hearing, defendant's oral arguments were consistent with his written motion. The State contended that the court, not Dr. Weitl, made the ultimate determination as to whether defendant was still sexually dangerous, and the facts to which Dr. Weitl testified supported the court's conclusion. The State also argued that defendant's actuarial scores decreased only because he turned 60, and his participation in treatment since returning to custody in 2020 had been inconsistent. In addition, the State contended that the court had a better understanding of

defendant's history than Dr. Weitl because it had presided over his case since 2017, whereas Dr. Weitl conducted just one evaluation of defendant in 2024.

¶ 45    The court denied defendant's motion to reconsider. The court acknowledged that Dr. Weitl opined that defendant was no longer sexually dangerous and that it could not arbitrarily ignore her unrebutted opinion. But the court explained that

> "everything else that [Dr. Weitl] testified to indicated that [defendant] still has the same sexual issues that are the underpinning of a sexually dangerous person finding. He still has those same sexual disorders. Now he's much older. He's still in very good physical health. But he still has those same urges."

The court concluded that the State established by clear and convincing evidence that defendant remained a sexually dangerous person.

¶ 46    Defendant timely appealed.

¶ 47                                    II. ANALYSIS

¶ 48                                    A. Jurisdiction

¶ 49    As explained above, the State charged defendant under two case numbers, 78 C 941 and 78 C 942. The trial court's order adjudicating defendant a sexually dangerous person bears both case numbers. However, a handwritten docket sheet in the record indicates that case number 78 C 941 was stricken on leave to reinstate (SOL'd) on October 25, 1979. Defendant submits that an appeal in only case number 78 C 941 may be "both untimely and moot," but maintains that this court nevertheless has jurisdiction over the appeal in case number 78 C 942. The State does not contest our jurisdiction.

¶ 50    The trial court adjudicated defendant a sexually dangerous person in case number 78 C 942 and the 2024 recovery application proceedings that are the subject of this appeal occurred under case number 78 C 942. The trial court's orders denying defendant's recovery application and motion to reconsider both bear case number 78 C 942, and defendant's notice of appeal also bears case number 78 C 942. Proceedings under the Act are civil in nature (725 ILCS 205/3.01 (West 2024)), and the rules governing civil appeals apply (*People v. McVeay*, 2021 IL App (2d) 190292, ¶ 8 (citing *People v. Kennedy*, 43 Ill. 2d 200, 203 (1969)). Defendant timely appealed within 30 days of the trial court's denial of his motion to reconsider. See Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). Therefore, we have jurisdiction over the appeal in case number 78 C 942.

¶ 51    Defendant's concern about a potential lack of jurisdiction in case number 78 C 941 is unwarranted. Even if case number 78 C 941 was SOL'd, it appears to still be pending. "Because a case which has been SOL'd remains pending, the statute of limitations for filing the underlying criminal charges is tolled while the statutory speedy-trial period continues to run as long as the defendant demands trial." (Internal citation omitted.) *Ferguson v. City of Chicago*, 213 Ill. 2d 94, 101 (2004). As best we can tell, defendant never demanded trial in this case, so it is possible that the statute of limitations was tolled and the speedy trial period never began running. See *Vincent v. Williams*, 279 Ill. App. 3d 1, 4 (1996) ("In the absence of a demand for immediate trial, the statutory period for bringing a criminal charge to trial does not begin to run."). Therefore, it appears that case number 78 C 941 never terminated. See *Franklin v. Godinez*, No. 22 CV 2886, 2023 WL 8357931, *3 (N.D. Ill. Dec. 1, 2023).[2] The printed docket sheet for case number 78 C 941 states

---

[2]We cite federal district court decisions as persuasive authority. *Home Star Bank and Financial Services v. Emergency Care and Health Organization, Ltd.*, 2012 IL App (1st) 112321, ¶ 37 n.3.

that the case is "[a]ctive." But we need not definitively resolve this somewhat unusual situation as we clearly have jurisdiction over the appeal in case number 78 C 942 for the reasons stated above.

¶ 52                                  B. Sufficiency of the Evidence

¶ 53     Defendant contends that the trial court's ruling that he remains a sexually dangerous person is against the manifest weight of the evidence. Defendant seeks either outright reversal or remand with directions requiring conditional release. Defendant also requests that, on remand, we direct this case to be reassigned to a different trial court judge.

¶ 54                              1. Burden of Proof and Standard of Review

¶ 55     A defendant committed under the Act may file a recovery application alleging that he is no longer sexually dangerous and therefore request discharge or conditional release. 725 ILCS 205/9(a) (West 2024). To justify continued commitment, the State must prove by clear and convincing evidence that the defendant remains sexually dangerous. *Id.* § 9(b). Clear and convincing evidence is "more than a preponderance of the evidence and not quite approaching the beyond-a-reasonable-doubt standard necessary to convict a person of a criminal offense." *People v. Craig*, 403 Ill. App. 3d 762, 768 (2010). Relevant here, if the court finds that the defendant

> "appears no longer to be dangerous but that it is impossible to determine with certainty under conditions of institutional care that the person has fully recovered, the court shall enter an order permitting the person to go at large subject to the conditions and supervision by the Director as in the opinion of the court will adequately protect the public." 725 ILCS 205/9(e) (West 2024).

¶ 56     We review the trial court's decision under the manifest weight of the evidence standard. *People v. Donath*, 2013 IL App (3d) 120251, ¶ 38. We will reverse the trial court's finding that

the defendant remains sexually dangerous only if the opposite conclusion is clearly apparent. *Id.* The trier of fact (in this case, the court) is in the best position to weigh the evidence and assess witness credibility. See *People v. Houde*, 2019 IL App (3d) 180309, ¶ 26.

¶ 57                                2. Sexually Dangerous Person Analysis

¶ 58    To prove that the defendant is a sexually dangerous person, the State must show that he suffers "from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the [State's] petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and [that he has] demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children." 725 ILCS 205/1.01 (West 2024).

¶ 59                                a. Mental Disorders

¶ 60    A mental disorder is a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 205/4.03 (West 2024).

¶ 61    Dr. Weitl diagnosed defendant with three mental disorders as of March 2024: sexual sadism in a controlled environment, antisocial personality disorder, and substance use disorder in a controlled environment. All three mental disorders predispose defendant to engage in acts of sexual violence. See *id.* As Dr. Weitl explained, sexual sadism in a controlled environment directly causes intense sexual urges involving acts in which the physical suffering of the victim is sexually exciting. Defendant described experiencing "sadistic fantasies and behaviors. When the victim suffered, he became more aroused." He admitted that he became aroused when he forced victims to crawl or kneel, struck them with whips or chains, tied them up, blindfolded them, or spanked

them, and when he sexually assaulted and strangled victims to overpower them. In addition, defendant suffers from antisocial personality disorder, which has manifested as him engaging in nonconsensual sex and violent acts such as fights and using weapons. Dr. Weitl also explained that defendant's substance abuse issues are "very entrenched in his criminal behavior" because he admitted "being under the influence whenever he committed a crime."

¶ 62    Evidence that a defendant has been diagnosed with sexual sadism disorder, antisocial personality disorder, and substance use disorder is sufficient to prove this element. See *People v. Belanger*, 2018 IL App (5th) 160191, ¶¶ 29-30. There is no indication that defendant no longer suffers from these mental disorders or that his diagnoses are no longer accurate. *Cf. People v. Guthrie*, 2016 IL App (4th) 150617, ¶¶ 24-25, 43 (the defendant was no longer sexually dangerous because under modern diagnostic criteria, he could no longer be diagnosed with a pedophilic mental disorder). Therefore, the State proved the first element of sexual dangerousness.

¶ 63                           b. Substantial Likelihood to Reoffend

¶ 64    The State must prove that the defendant has two types of propensities: (1) a criminal propensity to commit sex offenses and (2) a demonstrated propensity toward acts of sexual assault or molestation of children. 725 ILCS 205/1.01 (West 2024). The first type of propensity focuses on what the defendant is likely to do in the future whereas the second type of propensity focuses on what he has done in the past. See *In re Detention of Hunter*, 2013 IL App (4th) 120299, ¶¶ 45-50 (actuarial analysis of defendant's likely future conduct established the "criminal propensity" element and the defendant's prior convictions for criminal sexual abuse proved the "demonstrated propensity" element.)

¶ 65　A criminal propensity to commit sex offenses means that "it is substantially probable that the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined." 725 ILCS 205/4.05 (West 2024). "Substantially probable means much more likely than not." *In re Commitment of Gavin*, 2024 IL App (1st) 230246, ¶ 44. A defendant's substantial probability of reoffending "cannot be reduced to a mere mathematical formula or statistical analysis." *In re Detention of Hayes*, 321 Ill. App. 3d 178, 188 (2001). Rather, the trier of fact "must consider all factors that either increase or decrease the risk of reoffending, and make a commonsense judgment as to whether a [defendant] falls within the class of individuals who present a danger to society sufficient to outweigh their interest in individual freedom." *Id.*

¶ 66　Defendant's Static-99R score indicates that *among sex offenders* he presents an average risk of reoffending. Moreover, the only reason defendant's Static-99R score decreased from five to two was because he turned 60 years old in 2017. Even if aging generally makes sex offenders less likely to reoffend, defendant is physically fit, which makes his age less of a mitigating factor in his risk of reoffending. Relatedly, the Stable-2007 indicates that defendant still has a high need for treatment, supervision, and support. Dr. Weitl explained that the combined actuarial results indicate that defendant "falls in the Well Above Average priority category for intervention and supervision compared to other sex offenders." Evidence that a "defendant's assessment tool scores, when considered together, place[ ] him in the highest risk category for supervision and intervention needs when compared to other sex offenders" supports a finding that he remains sexually

dangerous. (Internal quotation marks omitted.) *People v. Kallal*, 2024 IL App (4th) 231201-U, ¶ 76.[3]

¶ 67 Although this element is primarily forward-looking, when a defendant has violated multiple prior conditional releases, that "support[s] the finding that a person would reoffend on release." *People v. Twining*, 2026 IL App (4th) 250693-U, ¶ 34 (citing *Gavin*, 2014 IL App (1st) 122918, ¶ 20). By his own admission, defendant's first conditional release from 2006 to 2009 involved acts of sexual deviance. The second conditional release from 2017 to 2020 did not involve sexual deviance (at least based on defendant's self-reporting), but there is no dispute that defendant violated the terms of that release twice and it was ultimately unsuccessful.

¶ 68 Defendant argues that Dr. Weitl did not testify that he was substantially probable to commit sex offenses if released. That is true, but defendant cites no authority holding that she had to expressly say that defendant was substantially probable to commit sex offenses if released. She did not and, for that matter, neither did the trial court. See *In re Commitment of Snapp*, 2021 IL 126176, ¶ 23 ("it is unnecessary for a circuit court to make a separate express finding that the respondent is substantially probable to reoffend after finding the respondent is a sexually dangerous person"). The question is whether the evidence supported a conclusion that defendant is substantially probable to reoffend if he is released. For the reasons explained above, it did.

¶ 69 Defendant complains that "the only sex offenses [he] is alleged to have committed occurred in 1978 or earlier." That is also true, but immaterial to this element. Defendant's prior acts of sexual assault are relevant to the third element, his demonstrated propensity to commit such acts,

---

[3]We cite Rule 23 orders issued after January 1, 2021, as persuasive authority. Ill. S. Ct. R. 23(e)(1) (eff. June 3, 2025).

not to this element, which examines his probable future conduct. See *People v. Lawton*, 212 Ill. 2d 285, 303 (2004). We observe that defendant's reply brief criticizes the State for conflating these two elements.

¶ 70　The cases defendant cites do not compel reversal. *People v. Bingham*, 2014 IL 115964, was based on an old version of the Act and cases that are no longer good law. *Snapp*, 2021 IL 126176, ¶ 20 (citing *Bingham*, 2014 IL 115964, ¶¶ 32-35). In *Gavin*, the State's expert "held out his analysis as scientifically rigorous but buckled when asked how he reached his conclusions." *Gavin*, 2024 IL App (1st) 230246, ¶ 66. For example, when using actuarial tools, the expert scored the defendant as if he was 37 or 38 years old when he was actually 64. *Id.* ¶¶ 49-51. The expert also concluded that the defendant was "about as high risk as you're going to get" even though the defendant used a cane to walk and had undergone surgeries for hip replacement and testicular removal. *Id.* ¶¶ 30, 49. Dr. Weitl's testimony did not feature such obvious contradictions and analytical mistakes. A reasonable factfinder, like the trial court in this case, could examine her actuarial testing and conclude that there is a substantial probability defendant will reoffend if he is released. Therefore, the State proved the second element of sexual dangerousness.

¶ 71　　　　　　　c. Demonstrated Propensity to Commit Sexual Assault

¶ 72　Finally, the State must prove that the defendant has "demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children." 725 ILCS 205/1.01 (West 2024). "To satisfy the demonstrated-propensities element under the Act, the State must prove the defendant has committed or attempted at least one act of sexual assault or molestation." *Lawton*, 212 Ill. 2d at 303 (citing *People v. Allen*, 107 Ill. 2d 91, 105 (1985)). Here, defendant admitted sexually assaulting at least seven elderly women in the 1970s. This evidence was sufficient to prove that

defendant had demonstrated propensities toward acts of sexual assault. See *In re Detention of Hunter*, 2013 IL App (4th) 120299, ¶ 46.

¶ 73    The State proved all the elements that qualify defendant as a sexually dangerous person under the Act, and based on the record before us, it is not clear that defendant is *not* sexually dangerous. See *Donath*, 2013 IL App (3d) 120251, ¶ 38. Accordingly, the trial court's conclusion that defendant remains a sexually dangerous person is not against the manifest weight of the evidence.

¶ 74                                    3. Defendant's Arguments

¶ 75                               a. Discretion to Reject Expert's Opinion

¶ 76    Defendant contends that the trial court did not have discretion to reject Dr. Weitl's unrebutted expert opinion that defendant appears to be no longer sexually dangerous.

¶ 77    A factfinder is not obligated to accept a psychiatric expert's opinion. *People v. Urdiales*, 225 Ill. 2d 354, 431 (2007). "Even if several competent experts concur in their opinion and no opposing expert testimony is offered, it is still within the province of the trier of fact to weigh the credibility of the expert evidence and to decide the issue." *In re Glenville*, 139 Ill. 2d 242, 251 (1990). In recovery proceedings under the Act, "the trier of fact is free to reject the expert testimony, even where it is uncontroverted or uncontradicted." *People v. Helle*, 2021 IL App (3d) 190140-U, ¶ 21 (citing *Glenville*, 139 Ill. 2d at 251). Therefore, the trial court had the discretion to reject Dr. Weitl's opinion that defendant no longer appears sexually dangerous.

¶ 78    That said, a factfinder's discretion to reject expert opinions is not unlimited. A trier of fact may not *arbitrarily* reject an unrebutted expert opinion. *Glenville*, 139 Ill. 2d at 251. Moreover, a factfinder cannot disregard unrebutted expert testimony that "pertains to medical issues beyond

the understanding of a layperson" such as "medical diagnosis or analysis." (Internal quotation marks omitted.) *Helle*, 2021 IL App (3d) 190140-U, ¶ 23. But "determinations of the expert's credibility, the reliability of the underlying facts, or the soundness of the logical steps from facts to conclusions are well within the layperson's understanding." *Id.*

¶ 79    The trial court abided by these limitations. The court accepted and relied on Dr. Weitl's diagnoses of defendant's mental disorders. Although the court disagreed with Dr. Weitl's opinion that defendant appears no longer sexually dangerous, that disagreement was not arbitrary. The court explained that it disagreed with Dr. Weitl's opinion because (1) defendant still suffers from the mental disorders that cause his deviant and dangerous sexual urges; (2) the primary protective factor Dr. Weitl identified was defendant's age, which was undercut by his excellent physical health; (3) during his most recent conditional release, defendant demonstrated difficulty interacting with women; and (4) defendant's actuarial scores for recidivism and treatment needs are still relatively high.

¶ 80    Expert opinions can be flawed, which is why factfinders need not automatically accept them. In this case, prior expert opinions have proven to be inaccurate. Prior evaluators found defendant no longer sexually dangerous in 1998, 2004, and 2005, yet he engaged in sexually deviant behavior during his first conditional release between 2006 and 2009.

¶ 81    The cases defendant cites do not support the conclusion that the trial court erred in disagreeing with Dr. Weitl's opinion. For example, *Interest of Lena S.*, 2020 IL App (1st) 191293, and *People v. Baldwin*, 185 Ill. App. 3d 1079 (1989), hold that a trial court cannot reject an unrebutted expert opinion unless there is some basis in the record supporting the opposite conclusion. *Lena S.*, 2020 IL App (1st) 191293, ¶ 40; *Baldwin*, 185 Ill. App. 3d at 1087. The trial

court followed that principle. As explained above, the court disagreed with Dr. Weitl's opinion based on defendant's mental disorder diagnoses, actuarial testing, and prior unsuccessful releases.

¶ 82    Defendant also cites *People v. Thingvold*, 113 Ill. App. 2d 479 (1969), in which the Second District held that because four psychiatrists opined the defendant was no longer sexually dangerous, any ruling to the contrary would be against the manifest weight of the evidence. *Id.* at 483. This case involves only one expert witness, not four. More importantly, *Thingvold* does not reflect the modern state of the law. It was decided decades before cases holding that factfinders have discretion to reject unrebutted expert opinions, including expert opinions in sexually dangerous person cases. See, *e.g.*, *Glenville*, 139 Ill. 2d at 251; *Helle*, 2021 IL App (3d) 190140-U, ¶ 21. Accordingly, we find that the trial court did not err in rejecting Dr. Weitl's opinion regarding defendant's sexual dangerousness.

¶ 83                            b. Reliance on Substance of Expert Testimony

¶ 84    Finally, defendant argues that when the trial court rejected Dr. Weitl's opinion, the only remaining evidence consisted of the facts underlying that opinion, which were not admissible as substantive evidence. As defendant puts it, "the trial court rejected the opinion of Dr. Weitl but failed to then recognize that without the opinion of Dr. Weitl, there was no evidence at all to support [his] continued commitment as a sexually dangerous person."

¶ 85    Generally, the facts underlying an expert's opinion are admissible only to explain the basis for the expert's opinion, not as substantive evidence. *In re Commitment of Grant*, 2025 IL App (1st) 232492-U, ¶ 54 (citing *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 31). An expert may rely on and testify to hearsay or other inadmissible facts to explain the basis of her opinion if experts in her field would reasonably rely on such facts to form their opinions. *In re*

*Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 92. The factfinder may consider those facts only to decide what weight, if any, to give the expert's opinion. *Id.* The factfinder cannot consider the inadmissible underlying facts for their truth. *Id.* ¶¶ 92-93.

¶ 86    Defendant contends that the trial court committed evidentiary error by considering expert-basis evidence as substantive evidence. We review alleged evidentiary errors for an abuse of discretion. *Id.* ¶ 80. A court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. *Id.* The trial court was the factfinder at this recovery hearing, so we presume the court considered evidence only for its proper and limited purpose. *Id.* ¶ 98. "That presumption may be rebutted only by an affirmative showing to the contrary from the record on appeal." (Internal quotation marks omitted.) *Id.*

¶ 87    The record shows that the trial court relied on admissible evidence in concluding that defendant remains a sexually dangerous person. The court set out its reasoning for that conclusion in a detailed oral ruling. The court found that defendant had qualifying mental disorders based on Dr. Weitl's diagnoses. The court concluded that defendant was substantially likely to reoffend because (1) the chief protective factor Dr. Weitl identified, defendant's age, was undermined by his good physical health; (2) his scores on the actuarial testing Dr. Weitl conducted were relatively high; (3) he struggled interacting with women in his most recent conditional release; and (4) Dr. Weitl did not identify any specific coping mechanisms he could employ to control his deviant sexual urges. Finally, the court concluded that defendant had a demonstrated propensity to commit sexual assault based on his admission to sexually assaulting at least seven elderly women in the 1970s.

¶ 88    The evidence on which the trial court relied came from Dr. Weitl's testimony and defendant's statements, both of which were substantively admissible. A court may base sexual violence or dangerousness findings on in-person expert testimony that is subject to cross-examination, such as Dr. Weitl's testimony in this case. See *id.* ¶ 99. There is no dispute that Dr. Weitl could testify to her own evaluation and diagnosis of defendant. It was also proper for the court to consider evidence that came from defendant's statements, such as his admission to committing multiple sexual assaults in the 1970s. See *id.* ¶ 100-104 (the trial court properly relied on the defendant's statement admitting he committed sexual assault in 1987); *People v. Anderson*, 113 Ill. 2d 1, 12-13 (1986) (a psychiatric expert may testify to statements made to him by the defendant which figure in his diagnosis, whether he is a treating or nontreating physician). When offered by the State, defendant's statements were admissible as statements of a party opponent. See Ill. R. Evid. 801(d)(2)(A) (eff. Jan. 1, 2011); *Gavin*, 2014 IL App (1st) 122918, ¶ 4; *People v. Seaton*, 2023 IL App (5th) 200181-U, ¶ 38. The record does not establish that the trial court considered inadmissible facts underlying Dr. Weitl's opinion as substantive evidence. Accordingly, we affirm the trial court's finding that defendant remains a sexually dangerous person.

¶ 89    Because we affirm, we need not address defendant's request that we reassign the case to a different trial court judge on remand.

¶ 90                                    III. CONCLUSION

¶ 91    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 92    Affirmed.